**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| **MEGAN LISOTA,** individually and on behalf of all others similarly situated<br><br>*Plaintiff*,<br>v.<br><br>**HEARTLAND DENTAL, LLC**, a Delaware limited liability company, and **RINGCENTRAL, INC.**, a Delaware corporation,<br><br>*Defendants*. | Case No. 25-cv-7518<br><br>**PLAINTIFF'S OPPOSITION TO RINGCENTRAL'S MOTION TO DISMISS** |

# TABLE OF CONTENTS

**Page**


**I. INTRODUCTION ....... 1**

**II. SUMMARY OF ALLEGATIONS ....... 2**

**III. LEGAL STANDARD ....... 3**

**IV. ARGUMENT ....... 4**

**A. Plaintiff Adequately Pleads a Claim Under the Federal Wiretap Act ....... 4**

1. The Ordinary Course of Business Exemption Does Not Apply ....... 4

2. RingCentral Is Not Entitled to the Party Exception ....... 9

**B. Plaintiff's Intrusion Upon Seclusion Claim is Properly Pled ....... 14**

**V. CONCLUSION ....... 15**

## TABLE OF AUTHORITIES

**Cases**

*Am. Kitchen Delights, Inc. v. Signature Foods, LLC*,
No. 16-cv-08701, 2018 WL 1394032 (N.D. Ill. Mar. 20, 2018) ..................................... 12

*Ambriz v. Google, LLC*,
No. 23-cv-05437, 2025 WL 830450 (N.D. Cal. Feb. 10, 2025) ................................ 10, 11

*Barthel v. Illinois Central Gulf R.R. Co.*,
74 Ill. 2d 213 (1978) ................................................................................................... 13

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)....................................................................................................... 3

*Brooks v. Ross*,
578 F.3d 574 (7th Cir. 2009) ......................................................................................... 3

*Brown v. Google LLC*,
685 F. Supp. 3d 909 (N.D. Cal. 2023) ......................................................................... 11

*Burns v. Masterbrand Cabinets, Inc.*,
369 Ill. App. 3d 1006 (2007) ....................................................................................... 15

*Calhoun v. Google, LLC*,
113 F.4th 1141 (9th Cir. 2024) .................................................................................... 11

*Campbell v. Facebook Inc.*,
77 F. Supp. 3d 836 (N.D. Cal. 2014) ......................................................................... 5, 8

*Cunningham v. Cornell Univ.*,
604 U.S. 693 (2025)....................................................................................................... 4

*Dinerstein v. Google, LLC*,
484 F. Supp. 3d 561 (N.D. Ill. 2020) .......................................................................... 15

*EEOC v. City of Janesville*,
630 F.2d 1254 (7th Cir. 1980) ....................................................................................... 5

*Erickson v. Pardus*,
551 U.S. 89 (2007)......................................................................................................... 4

*Facebook, Inc. v. Duguid*,
592 U.S. 395 (2021)....................................................................................................... 5

*Gladstone v. Amazon Web Servs., Inc.*,
739 F. Supp. 3d 846 (W.D. Wash. 2024)................................................................ 10, 11

*Graham v. Noom*,
533 F. Supp. 3d 823 (N.D. Cal. 2021) .................................................................. 10

*Hackman v. Dickerson Realtors, Inc.*,
595 F. Supp. 2d 875 (N.D. Ill. 2009) .................................................................. 10

*Helena Agri-Enters. LLC v. Lee*,
No. 18-cv-02685, 2019 WL 13217376 (S.D. Ind. May 13, 2019)..................................... 9

*In re Google Assistant Priv. Litig.*,
457 F. Supp. 3d 797 (N.D. Cal. 2020) .................................................................. 5

*In re Google Inc. Cookie Placement Consumer Priv. Litig.*,
806 F.3d 125 (3d Cir. 2015)................................................................................ 9

*In re Google Inc. Gmail Litig.*,
No. 13-md-02430-LHK, 2013 WL 5423918 (N.D. Cal. Sept. 26, 2013) ............... 5, 6, 7, 8

*In re Google, Inc. Priv. Pol'y Litig.*,
No.12-cv-01382-PSG, 2013 WL 6248499 (N.D. Cal. Dec. 3, 2013)................................ 8

*In re Grp. Health Plan Litig.*,
709 F. Supp. 3d 707 (D. Minn. 2023) .................................................................. 14

*In re TikTok, Inc. In-App Browser Priv. Litig.*,
No. 24-cv-2110, 2024 WL 4367849 (N.D. Ill. Oct. 1, 2024) .................................. 4, 9, 11

*In re Trans Union Corp., Priv. Litig.*,
326 F. Supp. 2d 893 (N.D. Ill. 2004) .................................................................. 15

*Javier v. Assurance IQ, LLC*,
649 F. Supp. 3d 891 (N.D. Cal. 2023) .................................................................. 10

*K.L. v. Legacy Health*,
No. 23-cv-1886, 2024 WL 4794657 (D. Or. Nov. 14, 2024) .......................................... 14

*Kane v. Univ. of Rochester*,
No. 23-cv-6027, 2024 WL 1178340 (W.D.N.Y. 2024) .................................................. 13

*Kurowski v. Rush Sys. For Health*,
659 F. Supp. 3d 931 (N.D. Ill. 2023) .................................................................. 9

*Kurowski v. Rush Sys. for Health*,
No. 22-cv-5380, 2023 WL 8544084 (N.D. Ill. Dec. 11, 2023)........................................ 13

*Licea v. Am. Eagle Outfitters, Inc.*,
659 F. Supp. 3d 1072 (C.D. Cal. 2023) ........................................................................ 10

*Lovgren v. Citizens First Nat'l Bank of Princeton*,
126 Ill. 2d 411 (1989) ....................................................................................................... 15

*Matera v. Google Inc.*,
No. 15-cv-04062-LHK, 2016 WL 8200619 (N.D. Cal. Aug. 12, 2016)..................... 5, 6, 7

*McGowan v. Hulick*,
612 F.3d 636 (7th Cir. 2010) ............................................................................................. 4

*Physicians Healthsource, Inc. v. A-S Medication Solutions, LLC*,
950 F.3d 959 (7th Cir. 2020) ............................................................................................. 5

*Q.J. v. PowerSchool Holdings, LLC*,
No. 23-cv-5689, 2025 WL 2410472 (N.D. Ill. Aug. 20, 2025) ....................................... 10

*R.S. v. Prime Healthcare Servs., Inc.*,
No. 24-cv-00330, 2025 WL 103488 (C.D. Cal. Jan. 13, 2025)........................................ 13

*Ramirez v. LexisNexis Risk Sols.*,
729 F. Supp. 3d 838 (N.D. Ill. 2024)................................................................................ 15

*Roberts v. Charlotte Mecklenburg Hosp. Auth.*,
No. 3:24-cv-00382, 2025 WL 880538 (W.D.N.C. Mar. 20, 2025) .................................. 14

*Stein v. Edward-Elmhurst Health*,
No. 23-cv-14515, 2025 WL 580556 (N.D. Ill. Feb. 21, 2025)............................ 12, 14, 15

*Strong v. LifeStance Health Grp. Inc.*,
No. 23-cv-00682, 2025 WL 317552 (D. Ariz. 2025) ...................................................... 13

*Swanson v. Citibank, N.A.*,
614 F.3d 400 (7th Cir. 2010) ............................................................................................. 9

*Swierkiewicz v. Sorema N.A.*,
534 U.S. 506 (2002)............................................................................................................ 3

*Taylor v. ConverseNow Techs., Inc.*,
No. 25-cv-00990, 2025 WL 2308483 (N.D. Cal. Aug. 11, 2025) ................................... 10

*Thomas v. Pearl,*
998 F.2d 447 (7th Cir. 1993) ........................................................................................... 15

*U.S. v. Misc. Firearms, Explosives, Destructive Devices & Ammunition*,
376 F.3d 709 (7th Cir. 2004) ............................................................................................. 6

*Valencia v. Invoca, Inc.*,
No. 2:25-cv-01323, 2025 WL 3691970 (C.D. Cal. Nov. 17, 2025) ................................ 11

*Vega v. Chi. Park Dist.*,
958 F. Supp. 2d 943 (N.D. Ill. 2013) .................................................................... 15

*Vukadinovich v. Posner*,
No. 22-cv-118, 2023 WL 4931648 (N.D. Ind. June 21, 2023) ......................................... 9

*W.W. v. Orlando Health, Inc.*,
No. 24-cv-1068, 2025 WL 722892 (M.D. Fla. Mar. 6, 2025) ......................................... 14

*Williams v. TMC Health*,
No. 23-cv-00434, 2024 WL 4364150 (D. Ariz. Sept. 30, 2024) ..................................... 14

*Yi v. Sterling Collision Centers, Inc.*,
480 F.3d 505 (7th Cir. 2007) ................................................................................. 5

*Zak v. Bose Corp.*,
No. 17-cv-02928, 2019 WL 1437909 (N.D. Ill. Mar. 31, 2019) ....................................... 9

**Statutes**

18 U.S.C. § 2510 .......................................................................................... 4, 5, 6, 8

18 U.S.C. § 2511 .............................................................................................. 4, 9, 12

42 U.S.C. §1320d ................................................................................................. 12

45 C.F.R. § 164.502 ............................................................................................ 13

45 C.F.R. § 164.508 ............................................................................................ 13

**Other Authorities**

S. Rep. No. 90-1097 (1968), reprinted in 1968 U.S.C.C.A.N. 2112 ........................................... 6

**Rules**

Fed. R. Civ. P. 8 .................................................................................................... 3

**Treatises**

Restatement (Second) of Torts § 652B ......................................................................... 15

## I. INTRODUCTION

Before the recent AI boom, RingCentral focused its business on selling a more advanced alternative to traditional phone services. Instead of operating over physical telephone wires or cellular systems, RingCentral's phone products operate over the Internet (also called "Voice-Over-Internet-Protocol" or "VoIP"). For years, VoIP services did nothing more than mimic traditional phone lines: they facilitated live phone calls, often at a lower cost, with greater convenience. With the advent of artificial intelligence technologies like large language models, companies like RingCentral realized they could do more than furnish the infrastructure for Internet-based phone calls: they could create additional products that capture, analyze, and process the content of the conversations exchanged on those calls, too, and monetize them.

RingCentral leveraged its role as a provider of telephonic communication infrastructure to develop new technologies, taking advantage of its access to those data streams. Specifically, RingCentral created a separate AI technology product to sell to its business customers, particularly for use with managing customer relationships and service calls. In doing so, RingCentral AI operates like a virtual consultant, offering real-time advice to its clients on how to make sales and manage upset customers.

This case addresses the unconsented and undisclosed installation of RingCentral AI on the phone systems of thousands of dental offices, where RingCentral AI listened into conversations to maximize appointments and profit margins at the expense of patient privacy. Individuals like Plaintiff placed phone calls to their dental providers, and were not told that a virtual consultant, RingCentral's AI product, was hearing their every word, advising the other party on the line how to handle the call, and then processing that information to train its AI models. This is especially problematic when the calls concern medical care.

These practices are intrusive. Nobody expects a telephone company operator to listen in on their calls merely because it connects the call participants. It would be akin to the United States Postal Service selling a product called "Intelligent Delivery," whereby it opens the mail it is supposed to deliver, reads its contents, and then drafts a response for the recipient to use.

RingCentral's arguments for dismissal fail. First, the "ordinary course of business" exemption does not apply because it only allows service providers to route messages and monitor call quality, not to analyze the conversation or advise a call participant on how to handle a call. The party exception also does not apply because RingCentral can neither establish that it was a party to the conversation, nor that any party consented to its eavesdropping. Finally, RingCentral's challenge to the intrusion upon seclusion claim fails because the claim is based on RingCentral's interception, not republication of call information.

## II. SUMMARY OF ALLEGATIONS

RingCentral provides cloud-based telephone services to customers in Illinois, including Defendant Heartland Dental, a Dental Support Organization ("DSO") that provides administrative support to various dental practices. FAC ¶¶ 7, 11. RingCentral's telephone system is cloud-based, enabling businesses to make and receive calls from any device with an internet connection. *Id.* ¶¶ 12-13. This telephone product offers traditional phone system features, like the ability to direct calls, re-routing calls based on business hours, and allowing business customers to make and receive many calls at once. *Id.* ¶¶ 14-15.

This case is *not* about this telephone infrastructure, RingCentral's legacy product. Instead, in and around 2024, RingCentral developed a separate artificial intelligence software product called RingCentral AI. RingCentral AI is not a communications service. Instead, it is an add-on product that analyzes the *contents of conversations* that take place over RingCentral's phone lines. FAC ¶¶ 19-20. Plaintiff's complaint challenges this second suite of services. RingCentral AI recognizes speech to identify callers and transcribe calls "in real-time," generates summaries of conversations to allow RingCentral customers like Heartland to "see AI-generated key phrases, next steps, and follow-up items," and analyzes "the emotional tone of a phone conversation." *Id*. ¶¶ 23-25. These features are not part of RingCentral's telephonic communications product; instead, customers pay an extra fee to purchase these features, independently of RingCentral's telephone services. *Id*. ¶ 26. A business can purchase RingCentral AI without also using RingCentral's telephone services. *Id*. ¶ 27.

Heartland procures a phone system from RingCentral for its supported dental practices. FAC ¶¶ 30. In addition, Heartland uses RingCentral's Contact Center product to analyze and route patient calls to its overflow call centers, and its suite of AI products. *Id*. ¶ 31. RingCentral thus routes patient calls to a Heartland Patient Services Team in certain circumstances, but it also listens to *all incoming calls* to supported practices. *Id*. ¶¶ 32-33. For example, Heartland's Vice President of Patient Services Jeremy Stroud explained that RingCentral "*reviews all calls* that come into the supported practices*, in real-time*, and flags the ones from new patients where we might have missed an opportunity to set an appointment." *Id*. ¶ 33. In those situations, the app flags numbers for follow-up with the goal of setting appointments with new patients. *Id.*

During the last two years, Plaintiff called her dental office several times, identified herself by her name, and inquired about making appointments to receive medical treatment with her dental provider. FAC ¶ 42. Plaintiff and the proposed class members never consented to RingCentral's AI products listening to their calls with providers. *Id*. ¶¶ 58. Nonetheless, Heartland procured RingCentral to listen to and analyze all incoming patient calls, allowing RingCentral to use the data obtained from those HIPAA-protected calls to train and improve its services for the rest of its business customers. *Id*. ¶¶ 58-59.

## III. LEGAL STANDARD

At the pleading stage, a plaintiff need only make a "short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), that "give[s] the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (cleaned up and citation omitted). This rule "reflects a liberal notice pleading regime, which is intended to 'focus litigation on the merits of a claim' rather than on technicalities that might keep plaintiffs out of court." *Brooks v. Ross,* 578 F.3d 574, 580 (7th Cir. 2009) (quoting *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514 (2002)). To survive a motion to dismiss, a complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl.*, 550 U.S. at 570. At the pleading stage, courts must accept

factual allegations as true and draw all reasonable inferences in the plaintiff's favor. *McGowan v. Hulick,* 612 F.3d 636, 638 (7th Cir. 2010) (citing *Erickson v. Pardus,* 551 U.S. 89, 90 (2007)).

## IV. ARGUMENT

### A. Plaintiff Adequately Pleads a Claim Under the Federal Wiretap Act

The Federal Wiretap Act imposes liability on anyone that "intentionally intercepts [or] endeavors to intercept . . . any wire, oral, or electronic communication." 18 U.S.C. § 2511(1)(a). Plaintiff must plausibly allege that Defendants "(1) intentionally (2) intercepted, endeavored to intercept or procured another person to intercept or endeavor to intercept (3) the contents of (4) an electronic communication (5) using a device." *In re TikTok, Inc. In-App Browser Priv. Litig.*, No. 24-cv-2110, 2024 WL 4367849, at *9 (N.D. Ill. Oct. 1, 2024) (citation omitted).

Plaintiff alleges that Heartland enlisted RingCentral, through its AI technology, to surreptitiously eavesdrop and analyze all patient calls with Heartland-supported dental practices without patient consent. FAC ¶¶ 33, 45, 58, 59. She alleges that RingCentral utilized the data obtained from these real-time analyses to train and improve its services for the rest of its business customers, and that Heartland used these analyses to identify and solicit new patients. *Id.* at ¶¶ 68, 33. RingCentral does not dispute that these allegations are sufficient to state a prima facie claim under the Federal Wiretap Act, and instead argues only that one or more exemptions apply.

#### 1. The Ordinary Course of Business Exemption Does Not Apply

To be actionable, an interception must occur "through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4) (defining "intercept"). In relevant part, the Act exempts from its definition of device "any telephone or telegraph instrument, equipment or facility. . . being used by a provider of wire or electronic communication service in the ordinary course of its business." 18 U.S.C. § 2510(5)(a)(ii).[1] RingCentral bears the burden of invoking this affirmative defense. *See Cunningham v. Cornell Univ.*, 604 U.S. 693, 701 (2025).

[1] Neither Defendant invokes the other "ordinary course of business" exemption in 18 U.S.C. § 2510(5)(a)(i).

The central dispute is how the phrase "ordinary course of its business" in § 2510(5)(a)(ii) is construed. The word "its" refers back to the phrase "provider of wire or electronic communication service." *See Facebook, Inc. v. Duguid*, 592 U.S. 395, 404 (2021) (summarizing rule of last antecedent). The Act, in turn, defines "electronic communication service" to mean "any service which provides to users thereof the ability to send or receive wire or electronic communications." 18 U.S.C. § 2510(15). In context, § 2510(5)(a)(ii)'s reference to "its business" refers to the business of providing the electronic communication service, *i.e.*, "provid[ing] to users . . . the ability to send or receive wire or electronic communications." *Id.* *See*, *e.g.*, *In re Google Assistant Priv. Litig.*, 457 F. Supp. 3d 797, 818 (N.D. Cal. 2020) ("[The exemption] offers protection from liability only where an electronic communication service provider's interception *facilitates* the transmission of the communication at issue or *is incidental to* the transmission" of the communication.). RingCentral thus must establish that its AI products are necessary to provide users the "ability to send or receive" phone calls or messages.[2]

Several canons of statutory construction favor this interpretation. First, remedial statutes like the Federal Wiretap Act are construed liberally to protect consumers. *See Physicians Healthsource, Inc. v. A-S Medication Solutions, LLC*, 950 F.3d 959, 967 (7th Cir. 2020). Their exemptions are narrowly construed. *EEOC v. City of Janesville*, 630 F.2d 1254, 1258 (7th Cir. 1980); *Yi v. Sterling Collision Centers, Inc.*, 480 F.3d 505, 507 (7th Cir. 2007). RingCentral's interpretation, in contrast, would eviscerate the statute's protections by allowing any company "to unilaterally adopt any revenue-generating business practice, deem it 'routine,' and exempt itself from the Wiretap Act." *Matera*, 2016 WL 8200619, at *9.

[2] *See also Matera v. Google Inc.*, No. 15-cv-04062-LHK, 2016 WL 8200619, at *9 (N.D. Cal. Aug. 12, 2016) (analyzing email content did not fall within Google's "ordinary course" of providing email services); *Campbell v. Facebook Inc.*, 77 F. Supp. 3d 836, 844 (N.D. Cal. 2014) (analyzing social media message content not within ordinary course of providing messaging services); *In re Google Inc. Gmail Litig.*, No. 13-md-02430-LHK, 2013 WL 5423918, at *11 (N.D. Cal. Sept. 26, 2013) (hereinafter "*Gmail*") (requiring "nexus between Google's interceptions and its ability to provide the electronic communication service at issue in this case, email").

Second, in context, the term "in the ordinary course of its business" is a limiting phrase, not one of expansion. In other words, it serves to limit when covered electronic communication service providers are entitled to an exemption from liability. *See*, *e.g.*, *Matera*, 2016 WL 8200619, at *7 (emphasizing that the term "ordinary" limits the term "course of business" by implying that not all business activities are exempted); *Gmail*, 2013 WL 5423918, at *8 (same). If, instead, as RingCentral prefers, *any* action by an electronic communications service provider were exempted regardless of its nexus to the provision of the communication service in question, the limiting language would be superfluous and could be stricken without altering the meaning: "any telephone or telegraph instrument, equipment or facility, or any component thereof . . . being used by a provider of wire or electronic communication service ~~in the ordinary course of its business~~." 18 U.S.C. § 2510(5)(a)(ii) (modification added). Courts should avoid constructions that render a phrase "meaningless, redundant, or superfluous." *U.S. v. Misc. Firearms, Explosives, Destructive Devices & Ammunition*, 376 F.3d 709, 712 (7th Cir. 2004).

Finally, the interpretation adopted by *Matera* and *In re Google* is more consistent with the statute's structure and legislative history, as noted in both cases. The original language for this exemption was adopted in 1968. The Senate Report on the Omnibus Crime Control and Safe Streets Act of 1968, Title III (which includes the Federal Wiretap Act) explained its purpose was to "protect[] the privacy of wire and oral communications" and "delineat[e] on a uniform basis the circumstances and conditions under which the interception of wire and oral communications may be authorized." S. Rep. No. 90-1097 (1968), reprinted in 1968 U.S.C.C.A.N. 2112, 2153. It confirms that the exemptions were only intended to immunize those interceptions which enable service providers to route and deliver phone calls. *Id.* at 2153-54 ("[t]he only exceptions" include "employees of a communication common carrier . . . in the normal course of their employment *while engaged in any activity necessary to the rendition of service*"); *id.* at 2179 (statutory definition of a covered device "intends to be comprehensive"); *id.* at 2182 (noting the exemption for service carrier employees is intended to "insure that service observing will not be used for any purpose other than mechanical and service quality control").

When Congress updated the statute to novel forms of electronic communication (not just those over traditional telephone wires) with the Electronic Communications and Privacy Act ("ECPA"), the Senate Report reiterated the distinction between monitoring for service functionality and observing or listening to the content of a conversation. The *Matera* and *Gmail* courts both relied on this legislative history to confirm that § 2510(5)(a)(ii) was designed to only allow communication providers to maintain and operate those systems, not to protect "any interception that benefits an electronic communication service provider's business model." *Matera*, 2016 WL 8200619, at *13; *Gmail*, 2013 WL 5423918, at *10.[3]

The detailed analyses in both *Matera* and *In re Google* are instructive here, and RingCentral ignores the new allegations in Plaintiff's Amended Complaint that preclude application of the exemption at the pleading stage. Previously, the Court construed Plaintiff's allegations as if RingCentral's communications product was an AI-powered telephonic system. Dkt. 38 at 6. The Amended Complaint clarifies that RingCentral in fact offers two distinct products. One is its Internet-based phone product, which facilitates the making and receiving of calls. FAC ¶¶ 11-17. RingCentral has offered that product since 1999. The second product—the one challenged in this case—is RingCentral's AI product, launched in 2024, FAC ¶ 19, and which is wholly separate from its role as a provider of electronic communications services, *i.e.*, telephones, *id.* ¶¶ 20-25. For example, RingCentral's AI products are purchased separately, meaning a customer does not need to purchase its AI product to use its telephone products and vice versa. *Id.* ¶¶ 26-27. In other words, the RingCentral AI—the listening device challenged in this case—connects and then listens to the substance of conversations on RingCentral phone lines, but is not necessary to providing the phone service itself. *Id.* ¶ 26. Only RingCentral's phone connectivity qualifies as the business of providing an "electronic communication service." RingCentral AI, on the other hand, is a different product that analyzes the contents of the phone

---

[3] The court in *Gmail* also noted that the business reasons for the interceptions must be "legitimate" thus, an interception that violates another law, like HIPAA, cannot fall within a provider's ordinary course of business. See *Gmail*, 2013 WL 5423918, at *8.

conversations passing through its system, rather than one that "provides to users thereof the ability to send or receive wire or electronic communications." 18 U.S.C. § 2510(15). *Cf. Gmail*, 2013 WL 5423918, at *9 (holding that Google could not rely on ordinary course of business exemption to read the contents of emails for purposes other than delivering the communication). Analysis of patient sentiment, prediction of whether a patient is new or returning, and suggestions for upselling a patient have nothing to do with the ability to send or receive communications. Thus, in analyzing Plaintiff's phone calls with her dental provider, RingCentral was not acting as an electronic communications services provider (*i.e.*, in its capacity as a phone provider), but rather as a virtual consultant through its AI product. Its interceptions, therefore, are not exempt under the Wiretap Act.

This reasoning is also consistent with the contemporary reality that businesses tend to offer many different products and services. A reading of the statute which exempts *any* conduct that falls within a communications provider's "core businesses"—including core businesses beyond the statutory definition of "electronic communications services"—would exempt a far broader swath of conduct than Congress contemplated. For example, Google is a company with many internet-based products and services. Some, like sending and receiving emails, qualify as electronic communication services. But others, like its search engine business or advertising technologies, do not. The fact that search engines and advertising are otherwise "legitimate" businesses does not mean that they also "provide[] to users thereof the ability to send or receive wire or electronic communications." 18 U.S.C. § 2510(15).[4] Any other conclusion would allow any company with an electronic communications business line to immunize other business practices, effectively exempting itself from privacy protections with no limiting principle. *Campbell v. Facebook Inc.*, 77 F. Supp. 3d 836, 844 (N.D. Cal. 2014); *In re TikTok*, 2024 WL

[4] To the extent RingCentral relies on *In re Google, Inc. Priv. Pol'y Litig.*, 12-cv-01382-PSG, 2013 WL 6248499, at *11 (N.D. Cal. Dec. 3, 2013) for the proposition that any legitimate business practice qualifies for the exemption, it is wrong for the reasons stated herein and in every other federal court decision to consider the issue, including *Matera*, *Campbell*, and *Gmail*. *In re Google* is an outlier.

4367849, at *14. Moreover, the unlawful use and disclosure of HIPAA-protected information cannot, as a matter of law, be considered a "legitimate" business practice.

### 2. RingCentral Is Not Entitled to the Party Exception

To qualify for the party exception, RingCentral must demonstrate that it is either "a party to the communication" or that "one of the parties to the communication has given prior consent to such interception." 18 U.S.C. § 2511(2)(d). It cannot make either showing.

#### a) RingCentral is not a party to the communications.

When someone places a phone call, the phone company that provides the lines is not a party to the conversation. If that were the case, the limited "ordinary course of business" exemptions for phone companies would be superfluous. The same is true here. RingCentral provides the telephonic infrastructure, but that does not make it a party to the calls it facilitates.

Instead, RingCentral argues that its role as a "technology provider" renders it effectively an extension of Heartland. In doing so, it makes two errors. First, it assumes that Heartland was a party to the calls. The term "party to the communication" refers to "one who takes part in the conversation," *Zak v. Bose Corp.*, No. 17-cv-02928, 2019 WL 1437909, at *3 (N.D. Ill. Mar. 31, 2019) (citing *In re Google Inc. Cookie Placement Consumer Priv. Litig.*, 806 F.3d 125, 143 (3d Cir. 2015)); *see also Kurowski v. Rush Sys. For Health*, 659 F. Supp. 3d 931, 938 (N.D. Ill. 2023). Plaintiff alleges she called her dental provider, Tru Family, not Heartland Dental. FAC ¶ 42. Indeed, the Court has already held that "[i]t is therefore plausible that when Lisota called, either Tru Family Dental staff *or* Heartland answered." Dkt. 38 at 8. Because either inference is plausible and inferences must, at this stage, be drawn in Plaintiff's favor, Plaintiff adequately alleges that it was in fact Tru Family Dental staff who answered her calls.[5] Moreover, because

---

[5] *See*, *e.g.*, *Helena Agri-Enters. LLC v. Lee*, No. 18-cv-02685, 2019 WL 13217376, at *4 (S.D. Ind. May 13, 2019) ("If there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6)." (quotation omitted)); *Vukadinovich v. Posner*, No. 22-cv-118, 2023 WL 4931648, at *27 (N.D. Ind. June 21, 2023) ("On a motion to dismiss, the Court cannot choose between two alternative explanations if both are 'plausible.'"), report and recommendation adopted as modified, No. 22-cv-118, 2023 WL 6211835 (N.D. Ind. Sept. 25, 2023); *accord Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010) ("'Plausibility' . . .

Heartland operators do not disclose that they are not Tru Family personnel, there is no way for a plaintiff to determine the true identity of their interlocutors before discovery. RingCentral's argument fails for this reason alone, and the Court need not reach the question of whether RingCentral can invoke the party exception if Heartland was in fact a party to the call.

RingCentral's second error is that it assumes that technology providers (RingCentral) are necessarily extensions of their clients (Heartland) for the purpose of applying the party exception. To support its position, it cites to *Graham v. Noom*, a case discussing the issue in the context of the California Invasion of Privacy Act ("CIPA"), not the Federal Wiretap Act,[6] and which did not involve phone calls but rather web browser analytics. 533 F. Supp. 3d 823, 832 (N.D. Cal. 2021). RingCentral ignores, however, the fact that *Graham* is an outlier, insofar as it held that a third-party ceases to be an extension of its client only if it *uses* the data for its own benefit, rather than merely its client's benefit. The overwhelming majority of federal courts to consider the issue have instead concluded that a third-party cannot be treated as an extension of its clients if it has the *ability* to use the data for its own purposes, regardless of whether it actually does so. *E.g.*, *Javier v. Assurance IQ, LLC* 649 F. Supp. 3d 891 (N.D. Cal. 2023).[7] Applying this standard, courts have found that a third-party's ability to use data for product-improvement precludes the party exception. *E.g.*, *Gladstone v. Amazon Web Servs., Inc.*, 739 F. Supp. 3d 846, 854-55 (W.D. Wash. 2024) (service provider's ability to "to improve its own products and services" with intercepted data showed that it was "capable of creating, recording,

---

does not imply that the district court should decide whose version to believe, or which version is more likely than not."); *Hackman v. Dickerson Realtors, Inc.*, 595 F. Supp. 2d 875, 879 (N.D. Ill. 2009) (holding that plaintiffs are not required "to exclude every plausible interpretation of the facts that [do] not support their theory of liability").

[6] The other case it cites, *Licea v. Am. Eagle Outfitters, Inc.*, was also decided under CIPA, not the Federal Wiretap Act. 659 F. Supp. 3d 1072, 1083 (C.D. Cal. 2023).

[7] *See also Q.J. v. PowerSchool Holdings, LLC*, No. 23-cv-5689, 2025 WL 2410472, at *8 (N.D. Ill. Aug. 20, 2025); *Taylor v. ConverseNow Techs., Inc.*, No. 25-cv-00990, 2025 WL 2308483, at *4 (N.D. Cal. Aug. 11, 2025); *Ambriz v. Google, LLC*, No. 23-cv-05437, 2025 WL 830450, at *3 (N.D. Cal. Feb. 10, 2025)

and retaining" data for its own purposes).[8] And in the federal context, the only in-circuit case to address the issue has declined to find providers of communications infrastructure, *i.e.*, a web browser, to be subject to the party exception. *In re TikTok*, 2024 WL 4367849, at *13. In any case, Plaintiff alleges both that RingCentral can use the data gleaned through these phone calls for its own purposes, and that it actually does so. FAC ¶¶ 38-39, 58. By either measure, RingCentral's motion must be denied.

**b) RingCentral cannot show any party consented to its intrusions.**

As the Court correctly noted, "if Tru Family Dental's local staff answered [Plaintiff's phone call], the 'party exception' argument holds only if Tru Family Dental consented (or if Heartland was otherwise a party to the call)." Dkt. 38, at 9. Consent is "an affirmative defense on which Defendants bear the burden of proof." *In re TikTok*, 2024 WL 4367849, at *8 (cleaned up and citation omitted); *Brown v. Google LLC*, 685 F. Supp. 3d 909, 933 (N.D. Cal. 2023) (placing the burden to establish consent under the Federal Wiretap Act on defendant). To make that showing, RingCentral must "show that a 'reasonable user viewing [Tru Family Dental's] disclosures would . . . have concluded that they unambiguously disclosed the data collection at issue." *In re TikTok*, 2024 WL 4367849, at *8 (quoting *Calhoun v. Google, LLC*, 113 F.4th 1141, 1147-48 (9th Cir. 2024)). "And at the motion-to-dismiss stage, [RingCentral] must do so using only the Complaint's allegations and any documents attached, incorporated by reference, or properly subject to judicial notice." *Id.*

Far from establishing consent, RingCentral's only consent arguments rely on the strained inference that the dental offices consented by virtue of their relationship with Heartland, without citing any evidence or caselaw in support. Consent is necessarily fact-intensive though, better decided on a factual record. *In re TikTok*, 2024 WL 4367849, at *9. And as this Court observed,

---

[8] Indeed, several courts, including the court in *Gladstone* have found that AI software products similar to RingCentral's are not parties to the communication for purposes of CIPA's party exemption. See *Gladstone*, 739 F. Supp. 3d 846, 854-55; *Valencia v. Invoca, Inc.*, No. 2:25-cv-01323, 2025 WL 3691970, at *5 (C.D. Cal. Nov. 17, 2025); *Ambriz*, 2025 WL 830450, at *2.

the scope of any valid consent to RingCentral's eavesdropping may touch on matters of agency and authority. Dkt. 38, at 9. Yet the existence and scope of such an agency relationship is itself a fact-intensive inquiry better assessed at a later stage. *See*, *e.g.*, *Am. Kitchen Delights, Inc. v. Signature Foods, LLC*, No. 16-cv-08701, 2018 WL 1394032, at *4 (N.D. Ill. Mar. 20, 2018) (a plaintiff "cannot reasonably be expected to allege specific details concerning the manner of the defendant's control because such a burden would require the plaintiff to have access to the defendant and agent's business records before discovery" (cleaned up)).

**c) Even if RingCentral is a party, the crime/tort exception applies.**

Even if the Court finds RingCentral was a party to the communication who provided consent, it should nonetheless decline to dismiss this action because the interception here was "for the purpose of committing [a] criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C. § 2511(2)(d). At the pleading stage, Plaintiff need only plausibly allege that RingCentral's interception was undertaken with "the purpose of committing an act that is a crime or a tort." *Stein v. Edward-Elmhurst Health*, No. 23-cv-14515, 2025 WL 580556, at *4 (N.D. Ill. Feb. 21, 2025), motion to certify appeal granted, No. 23-cv-14515, 2026 WL 594752 (N.D. Ill. Mar. 3, 2026).

The Health Insurance Portability and Accountability Act ("HIPAA") imposes federal criminal liability on anyone who either obtains or discloses "individually identifiable health information" (IIHA) without authorization. 42 U.S.C. §1320d-6. The term "individually identifiable health information" is defined in the statute as any information that:

> (A) is created or received by a health care provider . . . and (B) relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual, and— (i) identifies the individual; or (ii) with respect to which there is a reasonable basis to believe that the information can be used to identify the individual.

42 U.S.C. § 1320d(6). The Department of Health and Human Services' regulations implementing HIPAA also impose liability for unauthorized *use* of IIHI, as they concern the scope of both permitted *uses* and *disclosures* of protected information. *E.g.,* 45 C.F.R. § 164.502(b) (requiring that covered entities subject to HIPAA only use or disclose protected

information to the "minimum necessary to accomplish the intended purpose of the use, disclosure, or request"); 45 C.F.R. § 164.508 (enumerating uses and disclosures for which express patient consent is required, including for marketing purposes). Violations of statutes and regulations also constitute prima facie evidence of negligence under Illinois law. *See Barthel v. Illinois Central Gulf R.R. Co*., 74 Ill. 2d 213 (1978).

Here, Plaintiff alleges that she "identified herself by her name and inquired about making appointments to receive medical treatment." FAC ¶ 42. Heartland deployed RingCentral's software to intercept phone calls intended to be between Plaintiff and her provider. *Id.* ¶ 56. In undertaking this arrangement, Heartland intended to disclose the content of Plaintiff and the Class Members' phone calls to RingCentral without patient consent. *Id.* ¶ 59. RingCentral then used the intercepted IIHI in an unauthorized manner, to train and improve its AI technology. *Id.* ¶ 38, 58-59. These allegations suffice to establish that the intercepted conversations constituted IIHI under HIPAA, and have been sufficient to survive motions to dismiss under the crime/tort exception in similar cases. See e.g., *Kurowski v. Rush Sys. for Health*, No. 22-cv-5380, 2023 WL 8544084, at *3 (N.D. Ill. Dec. 11, 2023) (capture of physician's names, locations, and specialties with data tracking tool and sharing with third parties violated HIPAA); *see also Kane v. Univ. of Rochester*, No. 23-cv-6027, 2024 WL 1178340, at *7 (W.D.N.Y. 2024); *R.S. v. Prime Healthcare Servs., Inc.*, No. 24-cv-00330, 2025 WL 103488, at *5 (C.D. Cal. Jan. 13, 2025) (interception relating to plaintiff's "medical conditions, treatment details, appointment information, and the physician she selected" sufficient); *Strong v. LifeStance Health Grp. Inc.*, No. 23-cv-00682, 2025 WL 317552, at *5 (D. Ariz. 2025) (same).

RingCentral's assertion that the alleged HIPAA violation cannot be separated from the act of interception is incorrect. In deciding whether an act is sufficiently independent from the act of interception, courts evaluate whether the crime or tort hinges on improper use of the intercepted communication, rather than just the act of recording itself. *R.S.*, 2025 WL 103488, at *5 (intent to disclose data to third parties constituted an improper anticipated use of intercepted data, rendering HIPAA violation within crime/tort exception to one-party consent rule); *W.W. v.*

*Orlando Health, Inc*., No. 24-cv-1068, 2025 WL 722892, at *7 (M.D. Fla. Mar. 6, 2025) (same); *K.L. v. Legacy Health*, No. 23-cv-1886, 2024 WL 4794657, at *6 (D. Or. Nov. 14, 2024) (same). Here, the unlawful conduct serving as the basis of the HIPAA violation is the unauthorized use or anticipated use of patient call data to improve RingCentral's AI products and services for other customers. That use is independent from the act of intercepting patient calls.

RingCentral's two cherry-picked out-of-circuit authorities are outliers. One case concerned a website that disclosed the challenged practice to patients and explained that the purpose of the challenged practice (using online tracking technologies) was to help operate certain website features. *Roberts v. Charlotte Mecklenburg Hosp. Auth.*, No. 3:24-cv-00382, 2025 WL 880538, at *3 (W.D.N.C. Mar. 20, 2025). The other case employed a line of reasoning that has been rejected by most courts to consider the issue—that a motivation to make money cannot also be a criminal or tortious purpose. *Cf, Williams v. TMC Health*, No. 23-cv-00434, 2024 WL 4364150, at *4 (D. Ariz. Sept. 30, 2024), *with Stein*, 2025 WL 580556, at *5. Here, Plaintiff isn't challenging the motivation to make money, but the unlawful use of HIPAA-protected data. What's more, RingCentral's motivations, the scope of any agreements between Tru Family Dental and RingCentral, and the scope of any patient consent "require[] a factual undertaking" better assessed at a later stage. *In re Grp. Health Plan Litig.*, 709 F. Supp. 3d 707, 720 (D. Minn. 2023). *See also Orlando Health*, 2025 WL 722892, at *7 ("Application of the crime-tort exception appears more fit for resolution at summary judgment or trial than at the motion to dismiss stage").

### B. Plaintiff's Intrusion Upon Seclusion Claim is Properly Pled

An intrusion upon seclusion claim requires showing "(1) an unauthorized intrusion or prying into a plaintiff's seclusion; (2) the intrusion would be highly offensive or objectionable to a reasonable person; (3) the matters upon which the intrusion occurred were private; and (4) the intrusion caused anguish and suffering." *Vega v. Chi. Park Dist.*, 958 F. Supp. 2d 943, 959 (N.D. Ill. 2013) (cleaned up). "[T]he core of [intrusion upon seclusion] is the offensive prying

into the private domain of another." *Lovgren v. Citizens First Nat'l Bank of Princeton,* 126 Ill. 2d 411, 417 (1989) (citing Restatement (Second) of Torts § 652B cmt. a, b (1977)). An "example" of such an intrusion is eavesdropping by wiretap. *Ramirez v. LexisNexis Risk Sols.*, 729 F. Supp. 3d 838, 850 (N.D. Ill. 2024).

RingCentral only disputes whether Plaintiff has sufficiently pled the first element, an intrusion. First, it argues that its conduct was exempt from liability under the Federal Wiretap Act, so the same conduct cannot be the basis for intrusion upon seclusion. This argument fails because, as explained above, RingCentral's conduct was not exempt. *See* Section IV.A, *supra*.

Second, RingCentral argues that Plaintiff challenges the publication/sharing of her communications, rather than an intrusion, and relies on cases holding that republication is not actionable.[9] But Plaintiff alleges that RingCentral eavesdropped on live, private conversations she had with her medical providers. FAC ¶¶65-66. Although this conduct could be characterized as a disclosure of IIHI under HIPAA, her intrusion upon seclusion claim is based on RingCentral's interception. RingCentral's authorities are therefore inapposite. This case is more comparable in kind to cases which dealt with one party's hiring of a private investigator to surveil an unsuspecting victim. *E.g.*, *Burns v. Masterbrand Cabinets, Inc.*, 369 Ill. App. 3d 1006, 1008 (2007). Enlisting another, unknown third-party to wiretap a phone does not transform the claim from an intrusion claim to a publication claim.

## V. CONCLUSION

Plaintiff respectfully requests that the Court deny RingCentral's Motion to Dismiss in its entirety.

---

[9] *See Thomas v. Pearl,* 998 F.2d 447, 452 (7th Cir. 1993) (harm flowed from publication of a recorded conversation, not the recording itself by a known party); *In re Trans Union Corp., Priv. Litig.*, 326 F. Supp. 2d 893, 901-02 (N.D. Ill. 2004) (no intrusion because "plaintiffs voluntarily disclosed the information to third party creditors," who in turn lawfully reported it to defendant consumer reporting agency); *Dinerstein v. Google, LLC*, 484 F. Supp. 3d 561, 594 (N.D. Ill. 2020) (hospital's consented disclosure of health records to Google for research purposes); *Stein,* 2025 WL 580556, at *2 (republication of website activity to Facebook).

Dated: April 3, 2026

Respectfully submitted,

By: */s/ Nicole Cabañez*

Yaman Salahi (SBN 288752)
yaman@salahilaw.com
Nicole Cabañez (*pro hac vice*)
nicolec@salahilaw.com
**SALAHI PC**
505 Montgomery St., 11th Floor
San Francisco, California 94111
Tel: (415) 236-2305

*Attorneys for Plaintiff*