UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

Megan Lisota,

    *Plaintiff*,

v.

Heartland Dental, LLC *and* RingCentral,
Inc.,

    *Defendants*.

No. 25 CV 7518

Judge Lindsay C. Jenkins

### ORDER

Heartland Dental, LLC ("Heartland") provides non-clinical services to more than 1,700 dental practices nationwide. These include traditional telephone services via RingCentral Inc. ("RingCentral"), as well as RingCentral's suite of artificial intelligence-powered add-ons. As a result, RingCentral can monitor and analyze incoming calls to Heartland's affiliates. Megan Lisota, who often called a Heartland-supported clinic, argues that this "eavesdropping" violates both the Federal Wiretap Act and the common-law tort of intrusion upon seclusion. Having already dismissed the federal claim once, the court now dismisses Lisota's action with prejudice, concluding that any alleged "interception" occurred in the ordinary course of RingCentral's business.

## I.    Background

The court's prior opinion details the pertinent facts. [Dkt. 38.] To summarize, Megan Lisota receives dental services from Tru Family Dental, which outsources administrative functions to Heartland. [Dkt. 39, ¶¶ 5, 28.] Heartland, in turn, contracts with RingCentral to provide telephone services. [*Id.*, ¶¶ 2–3.] Included in these services, and more generally offered directly to RingCentral's corporate customers, is a "bundle of optional AI features to provide an 'AI-powered business communications platform.'" [*Id.*, ¶¶ 26–30.] RingCentral can then provide these customers with live transcriptions, summaries, and sentiment analyses of every call. [*Id.*, ¶¶ 22–25.]

Several times, Lisota called a Heartland-supported dental clinic, identifying herself by name and inquiring about making an appointment—all the while, and without her permission, RingCentral was "surreptitiously eavesdropping and analyzing her calls." [*Id.*, ¶¶ 42–45.] She says this conduct violated the Federal Wiretap Act and intruded upon her seclusion. Accordingly, she raises two putative

1

class action claims against Heartland and RingCentral, who again move to dismiss. [Dkts. 42, 43.]

## II. Legal Standard

A motion to dismiss pursuant to Rule 12(b)(1) challenges the court's subject-matter jurisdiction, while a motion to dismiss under Rule 12(b)(6) tests the legal sufficiency of the plaintiff's claims. In both cases, the court takes well-pleaded factual allegations as true and draws reasonable inferences in the plaintiff's favor. *Reardon v. Danley*, 74 F.4th 825, 827 (7th Cir. 2023); *Choice v. Kohn L. Firm, S.C.*, 77 F.4th 636, 638 (7th Cir. 2023). At the pleading stage, the court evaluates only whether the factual allegations "plausibly suggest" the existence of subject-matter jurisdiction under the familiar *Iqbal–Twombly* standard. *Silha v. ACT, Inc.*, 807 F.3d 169, 174 (7th Cir. 2015). *See also Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Then, to survive a motion to dismiss under Rule 12(b)(6), "a complaint's factual allegations 'must be enough to raise a right to relief above the speculative level.'" *Emerson v. Dart*, 109 F.4th 936, 941 (7th Cir. 2024) (quoting *Twombly*, 550 U.S. at 555 (2007)).

## III. Analysis

### A. Standing

Heartland first argues that Lisota lacks Article III standing to pursue her claims—an argument also raised in Defendants' original motions to dismiss. [Dkt. 42, at 9.] The court previously held that, because Lisota's injury resembles the tort of intrusion upon seclusion, she had standing to sue. In that, nothing has changed.

As explained in January, intangible injuries suffice so long as they bear "a 'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts." *TransUnion v. Ramirez*, 594 U.S. 413, 424 (2021) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016)). These include "four distinct [privacy] torts: intrusion upon seclusion, appropriation of another person's name or likeness, publicity given to another person's private life, and publicity that places one in a false light." *Nabozny v. Optio Sols. LLC*, 84 F.4th 731, 735 (7th Cir. 2023). "[E]avesdropping by wiretapping" is a quintessential example of the first, *see Ramirez v. LexisNexis Risk Sols.*, 729 F. Supp. 3d 838, 850 (N.D. Ill. 2024), and precisely what Lisota alleges here. [Dkt. 39, ¶¶ 43–45.] She also explicitly raises an intrusion-upon-seclusion claim in her amended complaint.

Heartland's challenge is fourfold. First, it emphasizes that Lisota alleges "no disclosure to third parties, misuse of her information, pecuniary loss, or other tangible harm." [Dkt. 42, at 10.] But this misunderstands the inquiry. She need not allege pecuniary loss or a tangible harm if her intangible harm resembles a common-law tort, and disclosure and misuse implicate different ones than intrusion upon

seclusion. Second and similarly, Heartland's objection to Lisota's allegations of "emotional distress"—which, to be sure, do not appear in her amended complaint in those words—misconceives the basis for the intrusion-upon-seclusion analogy. [*Id.*, at 10.] True, "[i]ntrusion upon seclusion requires more than just an emotional response," but that 'more' need only be "a particular kind of offensive intrusion"—a question that turns on what's recognized at the common law. *Pucillo v. Nat'l Credit Sys., Inc.*, 66 F.4th 634, 640 (7th Cir. 2023) (citing *Gadelhak v. AT&T Servs., Inc.*, 950 F.3d 458, 462–63 (7th Cir. 2020)). Heartland (correctly) distinguishes Lisota's situation from those recognized as "irritating intrusions," *id.*, at 10–11, but this, too, relies on the wrong analogy. *See Gadelhak*, 950 F.3d at 462 (noting that "eavesdropping and spying … pose a different kind of [recognized] harm altogether" than "irritating intrusions").

Third, Heartland argues that the analogy fails because she does not "plead any essential element of a claim for intrusion upon seclusion." [Dkt. 42, at 10.] But "[w]hether [she] would prevail in a lawsuit for common law invasion of privacy is irrelevant. It is enough to say that the harm alleged in her complaint resembles the harm associated with intrusion upon seclusion." *Persinger v. Sw. Credit Sys., L.P.*, 20 F.4th 1184, 1192 (7th Cir. 2021). Again, there is no question that the tort encompasses eavesdropping, and to force Lisota to *prove* she can establish such a claim—particularly when the merits are entangled with exceptions—would require this court to conflate standing with the merits. *See Booker-El v. Superintendent, Indiana State Prison*, 668 F.3d 896, 899–900 (7th Cir. 2012).

Finally, Heartland says that Lisota "merely asserts her call with Tru Family Dental *may* have been allowed to be 'intercepted' and that she was 'injured' as a result." [Dkt. 42, at 10 (emphasis in original).] This, too, strikes the court as an overly loose paraphrasing of the complaint, which more accurately alleges that "the RingCentral AI app listens to *all* calls made to its supported practices." [Dkt. 39, ¶ 33 (emphasis added).] As this court observed in its prior opinion, "it is reasonable to infer from her allegations that all calls to the clinic were intercepted in some form, including hers." [Dkt. 38, at 3 n.3.]

Heartland's motion to dismiss for lack of standing is therefore denied.

## B.    Federal Wiretap Act

Though she has standing to sue, Lisota's claim that Defendants violated the Federal Wiretap Act fails—also for reasons expressed in the court's first dismissal. In January, the court summarized the law as follows:

> The Act "imposes civil liability on anyone who 'intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral or electronic communication.'" *In re TikTok, Inc. In-App Browser Priv. Litig.*, 2024 WL 4367849, at *9 (N.D. Ill. Oct. 1, 2024) (citing

18 U.S.C. §§ 2511(1)(a), 2520(a)). Critically, the Act excepts interceptions "by a provider of wire or electronic communication service in the ordinary course of its business," § 2510(5)(a)(ii), as well as those by "a party to the communication or where one of the parties to the communication has given prior consent to such interception," unless done "for the purpose of committing any criminal or tortious act." § 2511(2)(d).

[Dkt. 38, at 5.] It then dismissed Lisota's claim on the basis that, at minimum, the "ordinary course of business" exception applied. [*Id.*] This was so because the relevant question was whether there exists "some nexus between the need to engage in the alleged interception and the [provider's] ultimate business, that is, the ability to provide the underlying service or good." [*Id.*, at 6 (citing *In re TikTok*, 2024 WL 4367849, at *13 (quoting *Matera v. Google Inc.*, 2016 WL 8200619, at *9 (N.D. Cal. Aug. 12, 2016)).] Here, the real-time listening helped facilitate RingCentral's AI-integrated phone services, so neither RingCentral (directly) nor Heartland (as a 'procurer') could be liable for any interception. [*Id.*, at 6–7.]

Resisting this conclusion, Lisota has amended her complaint to explain that "RingCentral facilitates its core telephone services not by real-time listening and analysis of consumer calls, but with high specialized VoIP equipment housed in data centers all around the nation." [Dkt. 39, ¶ 17.] Further, she says,

> RingCentral AI is a tool that is separate and distinct from its VoIP phone services. It is not (and was not) necessary to operate RingCentral's inbound and outbound telephone services. Instead, RingCentral AI is a different service offering. Using RingCentral AI is not integral to nor even closely related to making and receiving phone calls. RingCentral AI products are a suite of tools embedded on top of RingCentral's existing telephone service.

[*Id.*, ¶ 20.] She also emphasizes that "RingCentral AI services can be purchased separately from its telephone services" or "without the telephone service," *id.* ¶ 27, and that RingCentral has offered its internet-based phone product since 1999. [Dkt. 44, at 13.] Therefore, she says, recognizing RingCentral's AI services as falling within its ordinary course of business "would allow any company with an electronic communications business line to immunize other business practices, effectively exempting itself from privacy protections with no limiting principle." [*Id.*, at 15 (citing *Campbell v. Facebook Inc.*, 77 F. Supp. 3d 836, 844 (N.D. Cal. 2014); *In re TikTok, Inc. In-App Browser Priv. Litig.*, 2024 WL 4367849, at *14 (N.D. Ill. Oct. 1, 2024).] Put differently, the Act "was designed to only allow communication providers to maintain and operate those systems, not to protect any interception that benefits an electronic communication service provider's business model." [*Id.*, at 13 (cleaned up) (citing *Matera*, 2016 WL 8200619, at *13; *In re Google Inc. Gmail Litig.*, 2013 WL 5423918, at *10 (N.D. Cal. Sept. 26, 2013)).]

4

Lisota's own authorities compel a different conclusion. As *Campbell* says in parsing the Act's language, while "the word 'ordinary' serves to narrow the exception, … the term 'business' serves to broaden it." 77 F. Supp. 3d at 843–44, 846. Meanwhile, "use of the word 'its' indicates that the court must consider the details of [RingCentral's] business, and must not rely on a generic, one-size-fits-all approach that would apply the exception uniformly across all electronic communication service providers." *Id.* (also recognizing the need to read the exception "flexibl[y] enough to adapt to technologies that arose long after the statute's passage in 1986" because "[m]uch of what is ordinary today was not at all ordinary in 1986.") The court agrees with this review of the text, and it finds that the Act does supply a limiting principle—though not one so limiting as to render 'in the ordinary course of its business' synonymous with 'in the transmission itself.' Rather, the relevant 'business' must involve the underlying transmission, but it need not *only be* the transmission.

The statute uses the same "ordinary course of its business" language both for providers of electronic communication services *and* their subscribers, whose respective businesses are necessarily broader than simply *receiving* transmissions (but which can certainly rely on the making and taking of calls). To that end, several circuits recognize that the exception applies when subscribers record conversations, so long as doing so is justified by an ordinary business use of the transmissions. For example, the Second Circuit permitted an alarm company to record calls to "facilitate access to their customers' premises," and to ensure accuracy in reports to police, fire departments, and other investigating authorities. *Arias v. Mut. Cent. Alarm Serv., Inc.*, 202 F.3d 553, 559 (2d Cir. 2000). The Tenth Circuit held that, when a company's employees use the phones to interact with the public, recording was appropriate based on "concern[s] by management over abusive language used by irate customers when called upon to pay their bills, coupled with the possible need to give further training and supervision to employees dealing with the public." *James v. Newspaper Agency Corp.*, 591 F.2d 579, 581 (10th Cir. 1979). The Eleventh Circuit then permitted an employer to listen into its employee's calls to determine whether it was business or personal. *Watkins v. L.M. Berry & Co.*, 704 F.2d 577, 583 (11th Cir. 1983). *See also Matera*, 2016 WL 8200619, at *12 (finding these holdings consistent with its narrow "nexus" test). It follows that the same language, as applied to *providers* of communications services, is not so limiting as to exclude transmission-adjacent business purposes.

Casting RingCentral's electronic communications business as no broader than its "legacy phone products," i.e., "allow[ing] businesses to make and receive phone calls and text messages," forces a one-size-fits-all approach that ignores what the complaint otherwise alleges: that RingCentral *"embed[s]* AI into [its] product portfolio" and *"integrates* [AI] seamlessly across [customer] calls, messages, meetings, and contact center.'" [Dkt. 39 ¶¶ 19, 21 (emphasis added).] RingCentral, after all, is not alleged to *be* a traditional telephone company, but to provide "a telephone product [that] offers '[e]verything you need to run your small business in one rich, robust

cloud communications system.'" [*Id.*, ¶ 14.] Priced separately or not, RingCentral AI is quite clearly an extension of RingCentral's *electronic communication business*, as opposed to some other business segment. As alleged, the interceptions have no application except in the context of calls and conversations. [*See id.* ¶ 23 (live transcription captures speaker identity and details in real-time); *id.*, ¶ 24 (summaries allow companies to see next steps and follow-up items); *id.*, ¶ 25 (sentiment analysis allows businesses to understand a person's emotional state); *id.* ¶ 33 (AI facilitates screening and routing).[1]]

In this way, Lisota's situation is different from those in the cases she cites, which involved internet messaging and interceptions to inform the distinct enterprise of targeted advertising. *See Matera*, 2016 WL 8200619, at \*14; *In re Google Inc. Gmail Litig.*, 2013 WL 5423918, at \*10; *Campbell*, 77 F. Supp. 3d at 844. *See also In re TikTok, Inc. In-App Browser Priv. Litig.*, 2024 WL 4367849, at \*7 (observing that the details of what data is collected and how it's used are unclear). RingCentral's interceptions are instead more like those that her authorities recognized as distinguishable, and which would presumably have fallen within the exception if challenged. *See, e.g., In re Google Inc.*, 2013 WL 5423918, at \*11 & n.4 (discussing spam filtering, antivirus protections, spell checking, language detection, and sorting). Indeed, whereas advertising is "purposively unrelated to [the] provision of email services" and is done for the provider's "own benefit," *id.* at \*11, RingCentral AI—like spam filtering—is embedded into the service and benefits the paying customer. Lisota can provide no case where a service so integrated with transmission falls outside the exception's ambit.[2]

To the extent RingCentral is alleged to have used patient calls for its own purposes, it's only to "train and improve its services." [Dkt. 44, at 10. *See also* Dkt. 39, ¶¶ 38–39 (citing RingCentral's privacy policy to support this allegation).] But these uses, as the court said in its previous opinion, are "incidental" to the provision of its electronic communication service. [Dkt. 38, at 7 (citing *Matera*, 2016 WL 8200619, at \*14).] *See also In re TikTok, Inc. In-App Browser Priv. Litig.*, 2024 WL 4367849, at \*14 (implicitly greenlighting the collection of data for "debugging, troubleshooting, and performance monitoring functions that are necessary to keep the App running smoothly," as opposed to other purposes).] Otherwise, and consistent with the alleged purpose and beneficiary of these interceptions, RingCentral is not alleged to itself have "review[ed] any of the raw data," which it collects for review by

---

[1]  At minimum, interceptions for the purpose of screening and routing bear a nexus to more traditional telephone services, too.

[2]  Lisota has moved to bring to this court's attention a California state court case involving a similar use of AI to analyze customer calls. [Dkt. 48.] The motion is granted insofar as the court has reviewed the case, which—similarities aside—does not involve the Federal Wiretap Act or its 'ordinary course of business' language. Rather, the statute specifically excepts *only* interceptions "for the purpose of construction, maintenance, conduct, or operation of" a company's telephone or utility services. [Dkt. 48-2, at 8.]

the call recipient. *See Matera*, 2016 WL 8200619, at *9 (discussing *Kirch v. Embarq Management Co.*, 702 F.3d 1245 (10th Cir. 2012), where the provider, who redirected traffic to a third-party, had "access to no more of its users' electronic communications than [it] necessarily had as an ISP").

In sum, though Lisota argues that Defendants seek to destroy any limiting principle, the court concludes that the facts here fall well within the one that plainly exists. The exception therefore bars RingCentral's liability for intercepting Lisota's data and—by extension—Heartland's liability for procuring the interception.[3]

### C.      Intrusion Upon Seclusion

Lisota's amended complaint also raises a claim for common-law intrusion upon seclusion, which requires her to plead: "(1) an unauthorized intrusion or prying into a plaintiff's seclusion; (2) the intrusion would be highly offensive or objectionable to a reasonable person; (3) the matters upon which the intrusion occurred were private; and (4) the intrusion caused anguish and suffering." *Vega v. Chi. Park Dist.*, 958 F. Supp. 2d 943, 959 (N.D. Ill. 2013) (cleaned up).

Regarding the first element, however, the Seventh Circuit has held that a "defendant can show authorization by pointing to a state or federal statute countenancing the intrusion." *Socha v. City of Joliet, Illinois*, 107 F.4th 700, 711 (7th Cir. 2024) (citing *Schmidt v. Ameritech Ill.*, 768 N.E.2d 303, 313 (Ill. App. 2002)). RingCentral does just that, arguing that "where (as here) a defendant's acts fall within one of the Federal Wiretap Act's specific carveouts, they necessarily do not constitute an intrusion upon seclusion under Illinois law." [Dkt. 43-1, at 16 (citing *Browning v. AT & T Corp.*, 682 F. Supp. 2d 832, 836 (N.D. Ill. 2009)).] Lisota concedes as much, arguing only that the defense fails because "RingCentral's conduct was not exempt." [Dkt. 44, at 21.] Consistent with the Seventh Circuit's endorsement of *Schmidt* (a Federal Wiretap Act case) and the parties' agreement about the derivative nature of the common-law claim, the "ordinary course of business" exception is similarly fatal to Lisota's allegations of intrusion upon seclusion.

---

[3]      Defendants also raise the "party" exception to liability, which asks whether either party to the call consented to the interception. Because it remains unclear whether Tru Family Dental, a plausible recipient of Lisota's call, ever (1) directly consented to RingCentral's activities or (2) gave Heartland the authority to consent on its behalf, the court again declines to dismiss on "party" grounds.

## IV.    Conclusion

The motions to dismiss are therefore granted. Because Lisota has already had an opportunity to amend, this dismissal is with prejudice.

Enter: 25-cv-7518
Date:   July 24, 2026

_____
Lindsay C. Jenkins
United States District Court Judge

8